UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| COREY TREUNAS GREEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:16-cv-127 |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Corey Treunas Green, on April 14, 2016. For the following reasons, the decision of the Commissioner is **AFFIRMED.**

*Background*

The plaintiff, Corey Treunas Green, filed an application for Supplemental Security Income on November 19, 2014, alleging a disability onset date of November 23, 2013. (Tr. 14). The Disability Determination Bureau denied Green's application on January 27, 2015, and again upon reconsideration on March 10, 2015. (Tr. 14). Green subsequently filed a timely request for a hearing on March 16, 2015. (Tr. 14). A video hearing was held on October 16, 2015, before Administrative Law Judge (ALJ) William E. Sampson, and the ALJ issued an unfavorable decision on January 21, 2016. (Tr. 14-26). Vocational Expert (VE) Sarah Gibson, Medical Expert (ME) Charles D. Auvenshine, and Green testified at the hearing. (Tr. 14). The Appeals

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4).

At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found that Green had not engaged in substantial gainful activity since November 19, 2014, the application date. (Tr. 16). At step two, the ALJ determined that Green had the following severe impairments: schizoaffective disorder, depressive disorder, learning disability, NOS, and history of substance abuse disorder in partial remission. (Tr. 16). At step three, the ALJ concluded that Green did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 16). Specifically, the ALJ determined that Green did not meet Listing 12.05 C, Intellectual Disability, because there was no evidence in the record to support that the onset of Green's impairment began before the age of 22, as required. (Tr. 17).

The ALJ found that Green's mental impairments did not meet or medically equal listings 12.02, 12.03, and 12.04. (Tr. 17). In finding that Green did not meet the above listings, the ALJ considered the paragraph B criteria for mental impairments, which required at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Tr. 17). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 17).

The ALJ determined that Green had mild restrictions in activities of daily living. (Tr. 17). Green testified that he lived with his mother, sister, and his sister's infant daughter. (Tr.

17). He indicated that he wore the same clothes daily and that he fed himself every other day. (Tr. 17). However, Green reported that he could prepare sandwiches and simple meals for himself. (Tr. 17). Green's mother contradicted his report that he could not perform household chores. (Tr. 17). She indicated that Green would start household chores but that he was unable to finish the tasks. (Tr. 17). Also, she reported that Green would leave the house two to three times a week. (Tr. 17). Green reported that his interests included talking to himself, while his mother indicated that he could watch television all day. (Tr. 17). Green also testified that he read headlines on Facebook and that he used Twitter. (Tr. 17).

The ALJ found that Green had mild difficulties in social functioning. (Tr. 18). Green reported that he stayed home daily. (Tr. 18). However, the ALJ noted that Green's self-report and his mother's report indicated that he went outside the home at least two to three times a week. (Tr. 18). Green reported that he felt like people were trying to harm him when he was around them and that he did not have any social skills. (Tr. 18). However, Green testified that he had worked as a part-time cashier at Dollar General and as a package handler for FedEx. (Tr. 18). Further, Green reported at the psychological consultative examination that he drank and smoked with friends during the day and that he would return home the next day or a few days later. (Tr. 18).

The ALJ concluded that Green had moderate difficulties in concentration, persistence, or pace. (Tr. 18). Green reported that he could not comprehend most things, which he indicated affected his ability to talk, hear, see, understand, follow instructions, complete tasks, concentrate, and remember things. (Tr. 18). However, the ALJ indicated that Green had obtained a GED. (Tr. 18). Further, the ALJ indicated that Green had participated in psychiatric treatment in November of 2014. (Tr. 18). Also, Green was able to pay attention to work-related tasks while

employed at Dollar General and FedEx. (Tr. 18). The ALJ indicated that Green was attentive during the hearing and that he responded to questions without a need for redirection. (Tr. 18).

The ALJ found that Green had not experienced any extended episodes of decompensation. (Tr. 18). Because Green did not have two marked limitations or one marked limitation and repeated episodes of decompensation, the ALJ determined that Green did not satisfy the paragraph B criteria. (Tr. 18). Additionally, the ALJ found that Green did not satisfy the paragraph C criteria. (Tr. 18).

The ALJ then assessed Green's residual functional capacity (RFC) as follows:

> the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations the claimant is limited to simple, routine, repetitive tasks; he can have occasional interaction with coworkers, and supervisors, but no interaction with the public; he can have no production pace work.

(Tr. 19). The ALJ explained that in considering Green's symptoms he followed a two-step process. (Tr. 19). First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical or laboratory diagnostic technique that reasonably could be expected to produce Green's pain or other symptoms. (Tr. 19). Then, he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Green's functioning. (Tr. 20).

Green has alleged symptoms that are consistent with schizoaffective disorder, depressive disorder, learning disability, NOS, and history of a substance abuse disorder in partial remission. (Tr. 20). He reported that he heard voices every day and that the voices told him to harm himself and others. (Tr. 20). Green also reported that he was depressed to the point that he was unable to do anything during the day. (Tr. 20). He indicated that he was unable to perform household chores or personal care activities without the assistance of his mother and his sister. (Tr. 20).

The ALJ found that Green's impairments could cause his alleged symptoms, but he did not find Green credible regarding the intensity, persistence, and limiting effects of his symptoms. (Tr. 20).

At Green's psychological consultative examination in March of 2014, he reported that he was filing for disability based upon a learning disorder, anger, bad hygiene, depression, and hearing voices. (Tr. 20). He indicated that he had been depressed for a year since being fired from his job. (Tr. 20). Later, Green claimed that he had been depressed since he dropped out of high school his junior year. (Tr. 20). Green indicated that he heard voices when he drank heavily and smoked marijuana. (Tr. 20). He reported that he began smoking marijuana in the 8th grade. (Tr. 20). Green indicated that he had smoked marijuana prior to attending the consultative examination. (Tr. 20). He also indicated that he began drinking heavily at the age of 16. (Tr. 20). Green reported that when he partied he used Ecstasy, Mali, Xanax, and Codeine mixed with beer. (Tr. 20).

The findings at the clinical interview indicated that Green had poor personal hygiene and his cooperation was variable, but that he displayed fair social skills and etiquette. (Tr. 21). Green also had good eye contact and his speech was intact. (Tr. 21). There were no delusions or hallucinations observed. (Tr. 21). Green reported that he smoked marijuana daily. (Tr. 21). Also, he reported that he smoked a large sum of marijuana the night before the examination and that he had used Ecstasy, Xanax, and Codeine to the point that he passed out. (Tr. 21).

During his mental status examination, Green displayed poor immediate memory and poor recent memory. (Tr. 21). He was unable to recall three words after five minutes and failed the serial seven exercise. (Tr. 21). However, the ALJ noted that he was oriented to time, person, and place, and that his speech was relevant, coherent, and goal-oriented. (Tr. 21). Green was

diagnosed with cannabis dependence, alcohol dependence, and a learning disability NOS. (Tr. 21). The examiners noted that Green arrived at the examination carrying a bag of marijuana and shoes. (Tr. 21). The examiners concluded that his visual and auditory hallucinations were induced by heavy drinking and substance abuse. (Tr. 21). Green was assessed to have a global assessment of functioning (GAF) score of 59, which reflected moderate difficulties in social, occupational, or school functioning. (Tr. 21).

In November of 2014, Green was admitted to the emergency room at Methodist Hospital Northlake for feeling suicidal. (Tr. 21). He indicated that he heard voices that told him to kill himself and to harm others. (Tr. 21). At the hospital, Green denied using alcohol or drugs, and reported that he never had used alcohol or drugs. (Tr. 21). Green exhibited disordered thought content, but he had normal new learning ability, recent memory, and remote memory. (Tr. 21-22). Methodist Hospital Northlake admitted Green for further evaluation. (Tr. 22).

Green underwent a psychiatric evaluation and was diagnosed with chronic paranoid schizophrenia with an acute exacerbation. (Tr. 22). At the evaluation, Green displayed fair hygiene and grooming. (Tr. 22). The ALJ noted that he had a poor attention span, displayed little eye contact, and his affect was guarded. (Tr. 22). Green was reported as having delusional thinking with paranoid ideation, but suicidal or homicidal ideations were not present. (Tr. 22). Green was assessed with a GAF of over 20, which reflected serious impairment in communication and judgment. (Tr. 22).

A week after Green was admitted to the hospital, Dr. Mohammad Butt, M.D. diagnosed Green with major depression with psychotic features and schizoaffective disorder, depressive type. (Tr. 22). The ALJ noted that Green's GAF score had risen to 50, reflecting someone with serious difficulty in social, occupational, or school functioning. (Tr. 22). Green had benefited

from the group and unit activity while at the hospital, and it was determined that he was stable enough to be discharged back to the community. (Tr. 22). At discharge, his prognosis was fair to guarded. (Tr. 22).

In December of 2014, Green underwent counseling and was diagnosed with a schizoaffective disorder. (Tr. 22). At the mental status examination, Green was reported as having normal appearance, mood, and affect. (Tr. 22). Also, his cognition, memory, and concentration were normal, and he did not display any hallucinations or delusions. (Tr. 22). Green reported that he was compliant with his medications and that he was not experiencing side effects. (Tr. 22). The ALJ noted that Green canceled his next two appointments. (Tr. 22).

In January of 2015, Green reported at the psychological consultative examination that he had been stressed and depressed since his father's death in October of 2014. (Tr. 22). He indicated that he was seeing a counselor at Edgewater once a month and receiving medication management from Dr. Butt. (Tr. 22). Green reported that he had daily suicidal thoughts and that he heard voices on a daily basis. (Tr. 22). He claimed that his medications were not effective. (Tr. 22).

Dr. Roger Parks, PsyD, performed a mental status examination and found that Green was capable of comprehending and remembering simple instructions, but that he had difficulty with concentration. (Tr. 23). Dr. Parks diagnosed Green with major depressive disorder with psychotic features. (Tr. 23). In October of 2015, Dr. Candice Anderson, M.D. completed a physical assessment of Green and diagnosed him with depression. (Tr. 23). She found that Green's depression would cause him to have extreme functional limitations in a competitive work environment. (Tr. 23). However, the ALJ indicated that he gave no weight to her opinion because diagnosing Green with depression was outside her professional purview as a primary

7

care physician. (Tr. 23). Also, the ALJ indicated that Green had seen her only once prior to the hearing and that those records were not submitted as medical evidence. (Tr. 23).

Dr. Auvenshine (ME) testified that Green's impairments equaled listings 12.03, Schizophrenia, and 12.04, Affective Disorders. (Tr. 23). The ALJ indicated that he gave no weight to Dr. Auvenshine's opinion. (Tr. 23). The ALJ discredited Dr. Auvenshine's testimony because when questioned about Green's substantial history of substance abuse, Dr. Auvenshine indicated that he believed Green's testimony that he was sober from all substances. (Tr. 23). Also, the ALJ indicated that he questioned the scrutiny of Dr. Auvenshine's review of the entire medical record based on his responses during the questioning at the hearing. (Tr. 23). The ALJ concluded that Dr. Auvenshine had not thoroughly reviewed the consultative examination report from March of 2014. (Tr. 23).

The ALJ found that Green was not fully credible. (Tr. 24). Green testified that he never had engaged in nor had any problems with smoking, alcohol, or illicit drugs. (Tr. 24). However, his testimony was contrary to what he reported at the consultative examination and his testimony at the hearing that he had stopped using marijuana a year prior to the hearing. (Tr. 24). Also, the ALJ found that his allegation of not being able to do anything during the day was not supported by his statement that he would go out with his friends to party. (Tr. 24). The ALJ noted that at the hearing Green repeatedly mentioned his disability but that he had an unwillingness to describe his symptoms. (Tr. 24). Further, the ALJ noted that Green had canceled counseling appointments. (Tr. 24). Therefore, the ALJ concluded that Green's allegations were less than fully credible. (Tr. 24).

The ALJ granted great weight to the opinions of the consultative examiners because their opinions were based on standardized tests, personal observations, and face-to-face examinations.

(Tr. 24). The ALJ granted some weight to the State agency psychological consultants, Drs. Benetta Johnson and Joelle Larson, who opined that Green could understand, remember, and carry out simple tasks, could relate at least on a superficial basis, and could manage unskilled tasks. (Tr. 24). Also, Drs. Johnson and Larson reviewed the medical evidence and determined that Green did not satisfy the paragraph B and C criteria of the listings. (Tr. 24). The ALJ granted some weight to Green's mother's opinion because she observed his daily living activities. (Tr. 24).

At step four, the ALJ found that Green had no past relevant work. (Tr. 25). Considering Green's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that he could perform, including hand packer (4,000 jobs statewide and 5,000,000 nationwide), sorter (1,500 jobs statewide and 200,000 nationwide), and salvage laborer (2,000 statewide and 90,000 nationwide). (Tr. 25).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence."). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206,

9

217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098. A court must affirm an ALJ's decision if the ALJ supported his findings with substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. § 416.920(b)**. If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his

past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. § 416.920(e)**. However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f)**.

Green has argued that the ALJ failed at Step three to properly evaluate listings 12.03 and 12.04. At step three, "in considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart,* 381 F.3d 664, 668–69 (7th Cir. 2004) (finding the ALJ's "two sentence consideration of the Listing of Impairments was inadequate and warrants remand"). For a claimant to show that he met a listed impairment, he is required to demonstrate that his impairment met each required criterion. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). A condition that met only some of the required medical criteria, "no matter how severely," cannot qualify as meeting a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990).

In this case, the ALJ specifically considered 12.02 (neurocognitive disorders), 12.03 (schizophrenic, paranoid, and other psychotic disorders), and 12.04 (depressive, bipolar, and related disorders). Listings 12.03 and 12.04 are part of the CFR's broader Listing for mental disorders. **20 C.F.R. § Pt. 404, Subpt. P, App. 1.** Each of these listings consists of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria). **20 C.F.R. § Pt. 404, Subpt. P, App. 1.** To satisfy any of these three listings, a claimant must show that his

11

impairment satisfies "the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment." **20 C.F.R. § Pt. 404, Subpt. P, App. 1.**

Paragraph B sets forth the impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The claimant's functional limitations are assessed by using the four criteria set forth in paragraph B of the listings: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. **20 C.F.R. § 404.1520a(c)(3).** Each functional limitation must be evaluated to determine the severity, taking into consideration "all relevant and available clinical signs and laboratory findings, the effects of the symptoms, and how the claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." **20 C.F.R. § 404.1520a(c)(1).** To satisfy the paragraph B criteria of Listing 12.03 or 12.04, the claimant must establish "marked" limitations in two of the first three areas, or "marked" limitations in one of these areas in addition to "repeated" episodes of decompensation of extended duration. **20 C.F.R. § Pt. 404, Subpt. P, App. 1.**

The ALJ discussed Green's functional areas and determined that he had mild restrictions in daily living, mild difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Tr. 18). Further, the ALJ found that Green had not experienced episodes of decompensation, which had been of extended duration. (Tr. 18). The ALJ concluded that because Green's mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration, paragraph B was not satisfied. (Tr. 18). Also, the ALJ determined that Green did not satisfy paragraph C criteria for listings 12.03 and 12.04. (Tr. 18-19).

The ALJ assigned some weight to the State agency psychological consultants who concluded that Green had mild restrictions in activities of daily living, mild limitations in maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. (Tr. 24). The consultants also did not find evidence that Green's mental impairments satisfied the paragraph C criteria. (Tr. 24). Therefore, the ALJ discussed listings 12.03 and 12.04 by name and offered more than a perfunctory analysis, as required. *Barnett,* 381 F.3d at 668–69.

However, Green has argued that the ALJ's analysis at Step three was inadequate because the ALJ failed to properly evaluate Dr. Auvenshine's (ME) testimony. In determining whether a claimant is disabled, the ALJ "will always consider the medical opinions in the case record together with the rest of the relevant evidence ... received." **20 C.F.R. § 404.1527(b).**[2] And, the ALJ must evaluate every medical opinion received. **20 C.F.R. § 405.1527(c).** This includes the opinions of non-examining sources such as state agency medical and psychological consultants, as well as outside medical experts consulted by the ALJ. **20 C.F.R. § 405.1527(e)(2).** The Code of Federal Regulations expressly permits an ALJ to employ a medical expert to review the evidence and render an opinion as to the nature and severity of a claimant's impairments and whether those impairments met or equaled any listings when making a disability determination. **20 C.F.R. § 404.1527.**

The ALJ is responsible for deciding whether a listing is met or equaled. **SSR 96–6p.** Whether a claimant's condition equals a listed impairment is "strictly a medical determination" and "the focus must be on medical evidence." *Florence v. Colvin,* 2013 WL 3724806, at *9

---

[2]  The Social Security Administration recently adopted regulations that change the standards applicable to the review of medical opinion evidence for claims filed on or after March 27, 2017. *See* **20 C.F.R. §§ 404.1520c**, 416.920c. Because the plaintiff's claim was filed before that date, those regulations do not apply here.

13

(S.D. Ind. 2013) (citing *Hickman v. Apfel,* 187 F.3d 683, 688 (7th Cir. 1999)). "[L]ongstanding policy requires that the judgment of a physician ... designated by the Commissioner on the issue of equivalence ... must be received into the record as expert opinion evidence and given appropriate weight." **SSR 96–6p.** The ALJ may not ignore these opinions and must explain the weight given to these opinions in his decision. **SSR 96-6p**. The better an explanation a source provides for an opinion, the more weight the ALJ should give that opinion. **20 C.F.R. § 404.1527(d)(3).** However, an ALJ may give less weight to the conclusions of medical sources to the extent they are inconsistent with other evidence. **20 C.F.R. § 404.1527(c)(4).** If an ALJ does so, he must "provide a sound explanation for rejecting" the medical source's opinion. *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013).

Dr. Auvenshine testified that Green met listings 12.03 and 12.04, singly and in combination. The ALJ indicated that he granted no weight to Dr. Auvenshine's opinion because when questioned about the March 2014 consultative examination, which indicated that Green had a substantial history of substance abuse, he testified that "he took Green at his word" that he was sober from all substances. (Tr. 23). Dr. Auvenshine found that although the medical evidence initially showed substance abuse, the abuse did not affect whether Green met or equaled a listing because subsequent medical evidence showed sparse, if any, substance use or full denial of substance abuse. (Tr. 50-51).

However, the Commissioner contends that Green's evidence of treatment the year prior to the hearing was limited. The treatment record included a hospitalization in November of 2014 and one therapy session. In November of 2014, the Methodist Hospital Northlake reported that the possible causes of Green's medical complaint included but were not limited to schizophrenia v. major depression with psychiatric features v. borderline personality disorder v. drug abuse v.

14

metabolic disturbance v. infectious process v. neoplasm of the brain. (Tr. 252). The ALJ also concluded that based on Dr. Auvenshine's responses to questioning at the hearing it appeared that he had not thoroughly reviewed the medical record, specifically the 2014 consultative examination report. (Tr. 23).

The ALJ need only "minimally articulate his reasons for crediting or rejecting evidence of disability." *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1995). Under this standard, the ALJ need not discuss every piece of evidence, but "the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009). If the ALJ rejects relevant and uncontradicted evidence, he must explain his reasons for doing so. *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985). Remand is appropriate at Step 3 only when "the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). The ALJ considered Dr. Auvenshine's testimony, and therefore he did not ignore any line of evidence. Further, he articulated his reasoning for not assigning weight to Dr. Auvenshine's opinion.

The Commissioner contends it was proper for the ALJ to question the medical expert's opinion on Green's substance abuse given that Dr. Auvenshine's justification was that he took Green at his word that he was not using drugs. The bottom line is that an ALJ can reject a medical opinion if it is inconsistent with other substantial evidence in the record so long as he explains his reasons for doing so. *Punzio v. Astrue***,** 630 F.3d 704, 710 (7th Cir. 2011). The record contained objective medical evidence that Green had a history of substantial substance abuse issues. Further, Dr. Auvenshine's opinion was not consistent with other evidence in the record, including the State agency psychological consultants' opinions. Therefore, the ALJ's

decision to reject Dr. Auvenshine's finding that Green met listing 12.03 and 12.04 was supported by substantial evidence.

Moreover, the Commissioner contends that Dr. Auvenshine's testimony did not explain how Green satisfied the requirements of the listings, specifically that Green satisfied paragraph B of the listings. These are not reasons that appeared in the ALJ's opinion, and thus they cannot be used here. ***SEC v. Chenery Corp.,*** 318 U.S. 80, 87–88, 63 S. Ct. 454, 87 L. Ed. 626 (1943). However, Green had the burden of proof at step 3 that he met the listing requirements. ***Ribaudo v. Barnhart,*** 458 F.3d 580, 583 (7th Cir. 2006).

Next, Green has argued that the ALJ erred in discounting the opinion of treating physician, Dr. Anderson. Thus, the RFC was unsupported by substantial evidence. A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. **20 C.F.R. § 404.1527(c)(2)**; *see **Bates v. Colvin***, 736 F.3d 1093, 1099 (7th Cir. 2013); ***Punzio v. Astrue***, 630 F.3d 704, 710 (7th Cir. 2011); ***Schmidt v. Astrue***, 496 F.3d 833, 842 (7th Cir. 2007). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." ***Clifford v. Apfel***, 227 F.3d 863, 870 (7th Cir. 2000) (quoting ***Scivally v. Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992)); *see* **20 C.F.R. § 404.1527(c)(2)** ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

However, Dr. Anderson did not qualify as a treating physician. At the hearing, Green testified that he had just been assigned to Dr. Anderson and that he had seen her only once. (Tr. 39). A non-treating source means a physician, psychologist, or other acceptable medical source

16

who has examined the claimant but does not have, or did not have, an ongoing treatment relationship with him. **20 C.F.R. § 404.1502.** Given Green's testimony, Dr. Anderson and Green had not establish an ongoing treatment relationship. Therefore, as a non-treating source, the ALJ was not required to assign controlling weight to Dr. Anderson's opinion. *See* ***White v. Barnhart,*** 415 F.3d 654, 658 (7th Cir. 2005) (finding that a doctor that examined claimant once fits the definition of a non-treating source and the ALJ is not required to assign controlling to weight to the opinion). A medical source's opinion is not entitled to controlling weight if it does not provide a longitudinal view, "the very reasons the Social Security regulations set out for giving substantial weight to a treating physician's opinion are absent." ***Scheck v. Barnhart,*** 357 F.3d 697, 702–03 (7th Cir. 2004).

The ALJ indicated that he granted Dr. Anderson's opinion no weight because her treating records were not submitted as medical evidence. Further, the ALJ indicated that Dr. Anderson was a primary care physician, therefore, her diagnosis of depression was outside her professional purview. Green contends that both reasons are erroneous.

Green has argued that it was the ALJ's duty to obtain Dr. Anderson's treatment records. However, the Commissioner contends that it was Green's duty to bring to the ALJ's attention everything that showed that he was disabled. **20 C.F.R. § 404.1512(a).** This means that Green needed to supply medical and other evidence that the ALJ may have used to reach conclusions about his medical impairment and its effect on his ability to work on a sustained basis. ***Scheck v. Barnhart***, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c). ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."); ***Bowen v. Yuckert,*** 482 U.S. 137, 146, n.5, 96 L. Ed. 2d

119, 107 S. Ct. 2287 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").

Although a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record. ***Thompson v. Sullivan,*** 933 F.2d 581, 585 (7th Cir. 1991). The Seventh Circuit has held that the ALJ has not failed to adequately develop the record where the claimant does not show he was prejudiced by a lack of development. ***Martin v. Astrue,*** 345 Fed. Appx. 197, 202 (7th Cir. 2009). "An omission is significant only if it is prejudicial" and the plaintiff cites "specific, relevant facts—such as medical evidence—that the ALJ did not consider." ***Nelms v. Astrue*,** 553 F.3d 1093, 1098 (7th Cir. 2009). Courts "generally respect the ALJ's reasoned judgment" with respect to how much evidence to gather. ***Luna v. Shalala,*** 22 F.3d 687, 692 (7th Cir. 1994). Therefore, as long as the ALJ has enough evidence before him to make a disability determination that is supported by substantial evidence, the record has been adequately developed. ***Thomas v. Barnhart*,** 54 Fed. Appx. 873, 878 (7th Cir. 2003). An ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made his best case. ***Sears v. Bowen,*** 840 F.2d 394, 402 (7th Cir. 1988) (citing ***Glenn v. Secretary of Health and Human Services,*** 814 F.2d 387, 391 (7th Cir. 1987)).

Green has not shown that the ALJ's failure to obtain Dr. Anderson's treatment records prejudiced him. To reiterate, under **20 C.F.R. § 404.1512(a)** it was Green's duty to bring to the ALJ's attention everything that showed that he was disabled. The ALJ's failure to obtain Dr. Anderson's treatment notes was not a significant omission that was prejudicial. Further, the ALJ indicated that Dr. Anderson was a primary care physician, therefore her diagnosis of depression was not within her professional purview. *See* **20 C.F.R. § 404.1527(d)(5)** ("We generally give more weight to the opinion of a specialist about medical issues related to her area of specialty

than to the opinion of a source who is not a specialist."). The ALJ considered Dr. Anderson's medical specialty and her expertise, along with any supporting evidence in the record and considered the consistency of the evidence with the record as a whole. Therefore, the ALJ properly evaluated Dr. Anderson's opinion.

Based on the foregoing reasons, the decision of the Commissioner is **AFFIRMED**.

ENTERED this 26th day of September, 2017.

/s/ Andrew P. Rodovich
United States Magistrate Judge